UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'08 CIV 4334

------------------------------------------------------x
JIM SLAYMON, individually and on           :
behalf of all others similarly situated,         :
                                                               :
                    Plaintiff,                            :
                                                               :
            -against-                                    :
                                                               :
SLM CORP., SLM CORP. RETIREMENT :
COMMITTEE, ALBERT L. LORD,            :
THOMAS J. FITZPATRICK, CHARLES     :
ELLIOTT ANDREWS, SANDRA              :
MASINO, JOHN MCMANUS and JOHN    :
AND JANE DOES 1 - 10,                       :
                                                               :
                    Defendants.                        :
                                                               :
------------------------------------------------------x



## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT ("ERISA")

Plaintiff Jim Slaymon ("Plaintiff") alleges as follows on behalf of himself and a class of

all other similarly situated participants (the "Participants") in the Sallie Mae ("SLM", "Sallie

Mae" or the "Company") 401(k) Savings Plan (formerly known as the Sallie Mae Employees'

Thrift and Savings Plan)(the "Plan"):

### INTRODUCTION

1.      This is a class action brought pursuant to § 502 of ERISA, 29 U.S.C. § 1132,

against the Plan's fiduciaries, including SLM, on behalf of Participants in and beneficiaries of the

Plan.

2.      Throughout the Class Period of January 18, 2007 through the present, the Plan

invested in SLM common stock or units ("SLM Stock" or "Company Stock"), which was offered

as one of the investment alternatives in the Plan.

1

3.    Plaintiff's claims arise from the failure of Defendants, who are the Plan's fiduciaries, to act solely in the interest of the Participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as is required by ERISA.

4.    This action is brought on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief, constructive trust, restitution, and other monetary relief.

5.    During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results which violated Defendants' fiduciary duties.

6.    Throughout the Class Period, defendants misrepresented and concealed that:

(a)    The Company failed to engage in proper due diligence in originating student loans to subprime borrowers, particularly those attending non-traditional institutions;

(b)    The Company was not adequately reserving for uncollectible loans in its non-traditional portfolio in violation of GAAP, causing its financial results to be materially misstated;

(c)    The Company failed to disclose known trends and uncertainties as required by SEC regulations concerning collection issues with its non-traditional loan portfolio;

(d)    The Company had far greater exposure to anticipated losses and defaults related to its non-traditional loan portfolio than it had previously disclosed;

(e)    The Company's business model was unprepared for legislative changes that would result in a reduction in federal student lender rate subsidies and an increase in lender risk to a much greater extent than represented by defendants;

2

(f)     Given the deterioration and the increased volatility in the subprime market and reductions in federal subsidies, the Company would be forced to tighten its lending standards on both its federal loans and private education loans which would have a direct material negative impact on its loan originations going forward; and

(g)     Given the increased volatility in the subprime market and reductions in federal subsidies, the Company had no reasonable basis to make projections about its ability to maintain its current student loan production levels or its ability to manage its costs.

7.     When the market began to learn the truth about SLM's problems, the Company's stock price dropped significantly from its Class-Period high of $57.98 per share.

8.     SLM's stock now trades at approximately $21 per share, which is less than half the price at which the Plan and its participants were acquiring the stock during the Class Period.

9.     At the same time that defendant Lord was causing the Plan and its Participants to acquire and hold SLM stock, and was issuing false statements, he was selling his own SLM stock for proceeds of more than $52 million.

10.     As a result of Defendants' fiduciary breaches, the Plan has suffered substantial losses, resulting in lost profits and the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants.

11.     Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

12.     Because Plaintiff's claims apply to the Participants and beneficiaries as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all Participants and beneficiaries of the Plan during the Class Period. Plaintiff also brings this action as a participant seeking plan-wide relief for breach of fiduciary duty on behalf of the Plan.

3

## JURISDICTION AND VENUE

13.    **Subject Matter Jurisdiction**: This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the laws of the United States." 28 U.S.C. § 1331.

14.    **Personal Jurisdiction**: ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are residents of the United States and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

15.    **Venue**: Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this district.

## PARTIES

16.    At all relevant times, Plaintiff was a participant in the Plan who held SLM stock in the Plan during the Class Period and has been damaged.

### Defendant SLM

17.    Defendant SLM, more commonly known as Sallie Mae, is a Delaware corporation with its headquarters at 11600 Sallie Mae Drive, Reston, Virginia.

18.    The Company was originally created in 1972 as the Student Loan Marketing Corporation, a federal government-sponsored entity. The Company began privatizing its operations in 1997, a process it completed at the end of 2004 when the Company terminated its ties to the federal government.

19.    The Company's common stock trades on the New York Stock Exchange under the symbol "SLM."

20.    Defendant SLM is a fiduciary of the Plan because it was named as the Plan Administrator during at least a portion of the Class Period.

21.    In the annual report on Form 5500 filed by the Plan with the Department of Labor ("DOL") on October 10, 2007, the Plan identified SLM as the Plan Administrator (in Box 3a).

22.    SLM is also the "Plan Sponsor" of the Plan within the meaning of ERISA. See Form 5500, dated October 10, 2007 (in Box 2a).

23.    SLM had effective control over the Plan-related activities of its directors, officers and employees and at all times acted through its Board of Directors as well as its officers and employees appointed to perform Plan-related fiduciary functions in the course and scope of their employment.

24.    Through its Board of Directors or otherwise, SLM had the authority and discretion to hire and terminate those officers and employees and had the authority and discretion to appoint, monitor, and remove officers and employees in their individual fiduciary roles with respect to the Plan. Accordingly, the actions of the Board of Directors, the Company's committees and other employee fiduciaries are imputed to SLM under the doctrine of respondeat superior.

25.    SLM is a named or de facto fiduciary of the Plan within the meaning of ERISA.

5

26.     SLM exercises discretionary authority with respect to managing and administering the Plan and its assets, including the selection of the Plan's investments.

**Defendant Lord**

27.     At all relevant times, defendant Albert L. Lord ("Lord") was a member of the SLM Board of Directors and was the Company's Chief Executive Officer and Vice Chairman.

28.     From March 2005 through January 2008, defendant Lord was Chairman of SLM.

29.     Upon information and belief, defendant Lord was a fiduciary of the Plan within the meaning of ERISA because he was a director of SLM and had the power to amend or terminate the Plan.

30.     As a result, the directors of SLM – including defendant Lord -- were named or de facto fiduciaries of the Plan.

31.     Alternatively, defendant Lord also was a fiduciary of the Plan because he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

32.     Defendant Lord also was a de facto fiduciary of the Plan because he issued Plan communications to Plan Participants during the Class Period, including statements in filings with the Securities and Exchange Commission (the "SEC") that were incorporated by reference into Plan documents.

33.     During the Class Period, while he was making false statements and omitting to disclose material information to Plan Participants, and while he was causing the Plan to acquire and hold SLM Stock, *defendant Lord sold 1.665 million shares of his personally-held SLM common stock, generating proceeds of more than $52.9 million for himself.* In December, 2007 alone, defendant Lord received proceeds of more than $30 million by selling his shares of SLM

6

Stock at the same time that he was causing the Plan to acquire and hold SLM Stock.

34.     Upon information and belief, defendant Lord sold at least some of those shares to the Plan in exchange for Plan assets.

**Defendant Fitzpatrick**

35.     Defendant Thomas J. Fitzpatrick ("Fitzpatrick") has been a director of SLM since 2000 and served as Chief Executive Officer and Vice Chairman of SLM from June 2005 to May 2007. Since May 2007 he has served as an Advisor of SLM.

36.     Defendant Fitzpatrick a fiduciary of the Plan because he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

37.     Defendant Fitzpatrick also was a de facto fiduciary of the Plan because he issued Plan communications to Plan Participants during the Class Period, including statements in filings with the SEC that were incorporated by reference into Plan documents.

**Defendant Andrews**

38.     Defendant Charles Elliott Andrews ("Andrews") served as Chief Financial Officer of the Company from February 2006 through January 2008.

39.     From May 2007 through December 2007, defendant Andrews also served as the Chief Executive Officer of SLM. He was named President in December 2007.

40.     Defendant Andrews is a fiduciary of the Plan because he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

41.     Defendant Andrews also was a de facto fiduciary of the Plan because he issued Plan communications to Plan Participants during the Class Period, including statements in filings

7

with the Securities and Exchange Commission (the "SEC") that were incorporated by reference into Plan documents.

**Defendant Retirement Committee and Its Members**

42.    Defendant SLM Corp. Retirement Committee (the "Plan Committee") consisted of various officers and employees of SLM who managed the operation and administration of the Plan.

43.    Defendant Plan Committee is a named fiduciary of the Plan.

44.    Defendant Plan Committee had the power under the Plan to amend the Plan in certain respects.

45.    Defendant Plan Committee exercised discretionary authority and discretionary control with respect to managing and administering the Plan and exercised authority or control with respect to managing the Plan's assets.

46.    Defendant Plan Committee had the responsibility for selecting, evaluating, monitoring and altering the makeup of the investment alternatives provided under the Plan.

**Defendant Sandra Masino**

47.    At all relevant times since June 8, 2007, Defendant Sandra Masino ("Masino") was the Chief Accounting Officer of SLM and, upon information and belief, was a member of the Plan Committee, making her a fiduciary of the Plan.

48.    Defendant Masino also was a fiduciary of the Plan because she signed Plan documents, including the Plan's annual report on Form 11-K, dated June 27, 2007, as the Plan Administrator.

49.    Defendant Masino was a fiduciary of the Plan within the meaning of ERISA because, upon information and belief, she was a member of Plan Committee, she made statements

8

to Plan Participants and she exercised discretionary authority with respect to: (i) managing and administering the Plan; and/or (ii) managing and disposing of the Plan's assets.

50.    Defendant Masino exercised discretionary authority and discretionary control with respect to managing and administering the Plan and exercised authority or control with respect to managing the Plan's assets.

**Defendant John McManus**

51.    At all relevant times, defendant John McManus ("McManus") was the Company's Vice President. Corporate Tax.

52.    Defendant McManus was a named fiduciary of the Plan because he signed the Plan's annual report on Form 5500 filed with the Department of Labor on October 10, 2007 and identified himself in that filing as the "individual signing as the plan administrator."

53.    Upon information and belief, defendant McManus also was a fiduciary because he was a member of the Plan Committee.

54.    Defendant McManus exercised discretionary authority and discretionary control with respect to managing and administering the Plan and exercised authority or control with respect to managing the Plan's assets.

**John and Jane Doe Defendants**

55.    Plaintiff does not currently know the identity of all Plan fiduciaries, including the identity of all members of the Plan Committee, during the Class Period. Therefore, Plaintiff has named some of those fiduciaries fictitiously as defendants John and Jane Doe 1-10 and will seek leave to join them under their true names if and when Plaintiff ascertains their true identity.

56.    During the Class Period, upon information and belief, each defendant was a fiduciary of the Plan because each defendant had discretionary authority with respect to

9

management of the Plan and/or the management or disposition of the Plan's assets.

57.    During the Class Period, each defendant acted as a fiduciary of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

## THE PLAN

58.    The Plan is an "employee pension benefit plan," as defined by §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

59.    The Plan is a legal entity which can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(l).  However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, Plaintiff seeks relief on behalf of the Plan.

60.    Alternatively, Plaintiff seeks relief on behalf of all Participants in the Plan in accordance with ERISA.

61.    The Company adopted the Plan for the benefit of its eligible employees and the eligible employees of SLM's subsidiaries.

62.    The Plan is a defined contribution plan and provides for elective contributions (on the part of the participating employees) and employer matching contributions.

63.    Under the Plan, participating employees may contribute a certain percentage (from 1 to 75 percent) of their compensation (subject to the ERISA and IRS limits) and, after one year of service, the Company will make matching contributions equal to 100% of the Participant's contribution up to 6% of the Participant's eligible compensation.

64.    Participants could invest their Plan assets in a number of different investment options, including various investment funds or in the SLM Stock.

10

## CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of themselves and the following class of persons similarly

situated (the "Class"):

> All persons who are Participants in or beneficiaries of the Plan at
> any time between January 18, 2007 through the present (the "Class
> Period") and whose accounts held Company stock or units in the
> SLM Stock Fund.

66.    The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Plaintiff at this time,

and can only be ascertained through appropriate discovery, upon information and belief there are

at least hundreds of members of the Class who participated in, or were beneficiaries of, the Plan

during the Class Period.

67.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class. Among the

questions of law and fact common to the Class are:

> (a)    whether Defendants each owed a fiduciary duty to Plaintiff
>        and members of the Class;
>
> (b)    whether Defendants breached their fiduciary duties to
>        Plaintiff and members of the Class by failing to act
>        prudently and solely in the interests of the Plan's
>        Participants and beneficiaries; and
>
> (c)    whether Defendants violated ERISA.

68.    Plaintiff's claims are typical of the claims of the members of the Class because

Plaintiff and the other members of the Class each sustained a diminution of vested benefits

arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

69.    Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation.

70.    Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.    Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class or parties to the actions, or substantially impair or impede their ability to protect their interests.

72.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

73.    Sallie Mae, through its subsidiaries, provides education financing in the United States. The Company was founded in 1972 and its primary business is to originate and hold student loans by providing funding, delivery and servicing support for education loans. The Company provides its loans through participating in the Federal Family Education Loan Program ("FFELP") and through offering non-federal guaranteed Private Education Loans.

74.    Sallie Mae also engages in a debt management operations business, which

provides a range of accounts receivable and collections services, including student loan default aversion services, defaulted student loan portfolio management services, contingency collections services for student loans and other asset classes, and accounts receivable management and collection for purchased portfolios of receivables. In addition, the Company purchases and manages sub-performing and non-performing mortgage loans. It also provides a range of other services to educational institutions, lenders, students and their families, and guarantee agencies.

75.    In recent years, Sallie Mae has engaged in equity forward contracts related to the Company's securities as a way to raise money without borrowing.

76.    In an equity forward contract an issuer sells its securities to a buyer and agrees to repurchase the shares for a greater amount in the future. The issuer is essentially placing a bet that the price of its shares will rise. If the market value of the underlying securities falls below certain predetermined "trigger" levels, the buyer of the contract has the right to terminate the contract and settle all or a portion of the original contract price.

77.    As of December 31, 2006, the Company had outstanding equity forward contracts to purchase 48.2 million shares of its common stock at prices ranging from $46.30 to $54.74 per share with trigger prices ranging from $20.84 to $35.58 per share. In February 2007, the Company amended its equity forward contracts whereby the trigger prices were reduced with the highest trigger price being $30.11 per share. As of February 28, 2007, the Company had outstanding equity forward contracts to purchase 48.2 million shares of its common stock at prices ranging from $43.50 to $54.74 per share with trigger prices ranging from $23.93 per share to $30.11 per share. Given the nature of equity forward contracts, it was imperative that the Company maintain its share price above the predetermined trigger levels throughout the Class Period.

13

78.    Furthermore, it was essential for Sallie Mae to maintain its share price in order to promote a merger agreement with another company. In October 2006, defendant Lord initiated negotiations with a private equity firm concerning the possibility of an acquisition of the Company. Thereafter the negotiations continued throughout the end of 2006 and into the beginning of 2007 with the Company entering into a merger agreement in April 2007.

79.    In a move to consummate the merger agreement, defendants misrepresented the Company's business and prospects to the market and to the Plan and its Participants. These false statements about Sallie Mae's business were extremely important to the market and made the Company an attractive acquisition target.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

80.    On January 18, 2007, SLM filed a report on Form 8-K with the SEC announcing its financial results for the quarter ended December 31, 2006.

81.    Defendant Andrews signed the Form 8-K and it was posted on the Company's website with other Plan documents.

82.    In the Form 8-K, SLM reported improved earnings and positively portrayed SLM's business. SLM reported that its total managed student loan portfolio increased 16 percent from one year ago and its "core earnings" had increased for the fourth quarter and year.

83.    On February 1 and 2, 2007, in the wake of this positive news, defendant Lord sold 400,000 shares of his SLM stock for an average price of $45.80 per share reaping $18.3 million in insider trading proceeds. At the same time that defendant Lord was selling his shares of SLM stock, he was causing the Plan and its participants to hold or acquire SLM stock with Plan assets.

84.    This stock sale by defendant Lord was especially fortuitous as it came days before the public release of President Bush's budget proposal on February 5, 2007 which would cut

student lender rate subsidies and increasing lender risk.

85.    The news sent SLM's shares down 9% in a day.

86.    The timing of defendant Lord's sale would later prompt separate investigations by the SEC, the U.S. House of Representatives' Committee on Education and Labor, and the U.S. Senate Committee on Health, Education, Labor and Pensions.

87.    On March 1, 2007, SLM filed its annual report on Form 10-K with the SEC for 2006.

88.    Defendants Lord, Fitzpatrick and Andrews signed the annual report for themselves and SLM.

89.    The annual report and SLM's other SEC filings were incorporated by reference into the Plan documents.

90.    As SLM's CEO and CFO, defendants Fitzpatrick (CEO) and Andrews (CFO) also signed Sarbanes-Oxley Act of 2002 certifications falsely stating that the Company's Form 10-K did not contain any material misstatements or omit material information and that the report fairly presented in all material respects the Company's financial condition and results of operations.

91.    These statements were untrue at the time they were made because they failed to disclose the problems that SLM was experiencing as alleged herein.

92.    On April 13, 2007, news surfaced that SLM was in talks to be sold to a private equity firm.

93.    On April 16, 2007, the Company issued a press release disclosing that J. C. Flowers & Co. signed a definitive agreement to purchase SLM Corporation for approximately $25 billon or $60.00 per share of common stock

94.    The press release disclosed that, "upon closing, Sallie Mae's current management

15

will continue to lead the company."

95.    On April 16, 2007, defendant Fitzpatrick delivered a letter to all Plan Participants

highlighting the value of the proposed transaction with J.C. Flowers and inviting the Plan

Participants to attend a "Town Hall" meeting that day.

96.    Later on April 16, 2007, defendants held the "Town Meeting" for the Company's

employees and participants in the Plan in which they described the proposed transaction with J.C.

Flowers.

97.    Defendant Fitzpatrick touted the proposed transaction and made the following

comments to Plan participants and others who attended the meeting which was broadcast to all

participants:

> "This morning in New York, we announced that Sallie Mae has
> agreed to be acquired by a consortium led by private equity firm
> J.C. Flowers & Co., including Bank of America and JP Morgan
> Chase. Our Board of Directors and management team welcome
> and embrace this transaction, as it benefits all our constituents. The
> terms of the agreement state that an investor group led by J.C.
> Flowers & Co., and including Bank of America and J.P. Morgan
> Chase will purchase Salllie Mae in a transaction valued at $25.2
> billion, or $60 per share. We expect that the acquisition will be
> complete in the second half of 2007. In the interim, Sallie Mae
> remains a publicly traded company. Today's announcement is very
> good news for our clients, shareholders and all of you, our
> employee-shareholders. In 1997, thanks to our Al Lord, our
> Chairman of the Board, Sallie Mae introduced equity practices that
> made employee ownership possible for all employees, not just a
> select few. We have held true to that philosophy long after other
> companies abandoned the notion. I am proud of our record on
> stock option grants to employees. After the closing of this
> agreement, Sallie Mae will be privately held and our stock will no
> longer trade on any exchange. Our stock option plans account for
> this type of event, which is known as a "change of control." When
> a change of control occurs, any unvested stock options will
> immediately vest. Your vesting will take place and your shares will
> be purchased by our new investors at the close of the transaction.
> No doubt, you have many other questions regarding your
> employment, your benefits, and your future opportunities. If you

have not already, you will be receiving a question and answer document that will address many of these topics to the greatest extent possible. We have always valued open communication at Sallie Mae and commit to keeping all our employees informed and updated during this transition. One way we will do that is through additional all employee meetings which will take place over the next two weeks at many of our locations. I look forward to seeing many of you during these visits. I also encourage you to visit our intranet and employee forum for additional updates. This agreement unlocks the value of Sallie Mae for all our shareholders - the value which has largely been ignored by the markets for the past few months."

98.    On April 17, 2007, the Company filed a Proxy Statement with the SEC on Form 14-A which included a copy of the Company's April 16, 2007 press release.

99.    Defendant Andrews signed the April 17, 2007 Proxy.

100.    On this news, Sallie Mae's stock price increased from the low $40s to the mid-$50s on unusually high volume.

101.    On April 24, 2007, the Company filed a Form 8-K with the SEC, signed by defendant Andrews, in which the Company announced its financial results for the first quarter of 2007.

102.    The Form 8-K reported "first-quarter 2007 earnings and performance results that include an 18-percent increase in the managed student loan portfolio to $150 billion from the year-ago quarter's $127 billion. Also during the quarter, the company originated $4.8 billion through its internal lending brands, a 35-percent increase over the year-ago period."

103.    On May 12, 20007 SLM filed its quarterly report on Form 10-Q with the SEC which defendant Andrews signed and which was incorporated by reference into the Plan documents.

104.    As SLM's CEO and CFO, defendants Fitzpatrick (CEO) and Andrews (CFO) also signed Sarbanes-Oxley Act of 2002 certifications falsely stating that the Company's Form 10-Q

did not contain any material misstatements or omit material information and that the report fairly presented in all material respects the Company's financial condition and results of operations.

105.    These statements were untrue at the time they were made because they failed to disclose the problems that SLM was experiencing at the time as alleged herein.

106.    On May 22, 2007 SLM filed a Form 8-K with the SEC announcing that defendant Fitzpatrick would leave SLM to "pursue other interests" and would "serve the company in an advisory role to facilitate an effective transition." It also announced that defendant Andrews had been appointed as Chief Executive Officer effective immediately.

107.    The Form 8-K quoted defendant Fitzpatrick falsely touting the strength of SLM's business:

> "I am proud of the work we have done at Sallie Mae, and pleased to be leaving the company at a time when our business is strong and entering a new phase in its history as a result of the purchase by the Flowers group. I wish C.E. [Andrews] and all my colleagues at Sallie Mae all the best in the future."

108.    On May 25, 2007, SLM filed its Preliminary Proxy Statement relating to the merger. Pursuant to the Proxy Statement, the Company disclosed that its officers and directors would receive large cash payments upon consummation of the merger and indemnity agreements which would protect the executives from past misconduct.

109.    At the time of the merger, defendant Lord was to receive a cash payment of approximately $225 million and defendant Andrews was to receive $16.1 million.

110.    On June 27, 2007, defendants filed an annual report for the Plan on Form 11-K with the SEC.

111.    Defendant Masino signed the Form 11-K as the Plan Administrator and on behalf of the Plan.

112.    SLM's website was linked to the SEC site which included the Plan's annual report together with the Company's other SEC filings.

113.    The Plan's Form 11-K reported that for 2006 the Plan's assets in the SLM Stock Fund were fairly valued at more than $53.8 million as of December 31, 2006.

114.    On July 11, 2007, the Company issued a press release entitled "SLM Corporation Provides Update on Transaction," which was later included in the Form 8-K that was filed by SLM with the SEC on July 17, 2007.  The press release stated in part:

> SLM Corporation, commonly known as Sallie Mae, today
> announced that, in connection with the April 15, 2007 agreement
> providing for the acquisition of Sallie Mae, the acquiring entity,
> owned by affiliates of J.C. Flowers & Co., Bank of America and
> JPMorgan Chase, has informed Sallie Mae that it believes that
> current legislative proposals pending before the U.S. House of
> Representatives and U.S. Senate "could result in a failure of the
> conditions to the closing of the merger to be satisfied."  Sallie Mae
> strongly disagrees with this assertion, intends to proceed towards
> the closing of the merger transaction as rapidly as possible and will
> take all steps to protect shareholders' interests.

115.    On July 17, 2007, the Company filed a Form 8-K with the SEC which as signed by defendant Masino and contained a copy of a press release entitled "Sallie Mae's managed loan portfolio grows 18 percent from prior year to $153 billion in second-quarter; Originations through Company's lending brands grow 39 percent."

116.    The Form 8-K reported that SLM's second-quarter 2007 earnings and performance results included "an 18-percent increase in managed student loans from the year-ago quarter, with the company's portfolio topping $153 billion.  Second-quarter 2007 preferred-channel loan originations were $3.6 billion, and loans originated through the company's internal brands, a segment of total preferred-channel loan originations, grew 39 percent from the year-ago period to $2.4 billion."

117.    The Form 8-K also quoted defendant Andrews as saying "our loan portfolio continues to register strong growth, and our internal brands are outpacing the market. We are delivering best-in-class products and services to schools, students and families to help them access higher education."

118.    Additionally, the Form 8-K reported other favorable financial results, including that:

> Sallie Mae reported second-quarter 2007 GAAP net income of $966 million, or $1.03 per diluted share, compared to $724 million, or $1.52 per diluted share, in the year-ago period. Included in these GAAP results are pre-tax gains on derivative and hedging activities of $822 million in the second-quarter 2007, compared to $123 million in the year-ago quarter, and a decrease of $671 million in gains on student loan securitizations. Second-quarter 2007 GAAP diluted earnings per share were reduced by $1.21 due to the reversal of unrealized gains on dilutive outstanding equity forward contracts as required by the GAAP diluted earnings per share calculation.

119.    But the Form 8-K also reported that SLM's "core earnings" had declined:

> "Core earning" net income for the second-quarter 2007 was $189 million, or $.43 per diluted share, down from $320 million, or $.72 per diluted share, in the year-ago quarter. These second-quarter 2007 results include a provision for losses of $247 million and $51 million in expenses related to the company's previously announced acquisition. Annualized net charge-offs as a percentage of average private education loans in repayment were 3.5 percent in the second-quarter 2007, compared to 3.4 percent in the prior quarter. For the first half of 2007, "core earnings" net income was $440 million, compared to $607 million in the first half of 2006.

120.    After this news, Sallie Mae's stock price retreated to the low $50s. Nonetheless, Sallie Mae maintained that the new legislation would not have a meaningful impact on its business.

121.    On August 7, 2007 SLM filed its quarterly report on Form 10-Q with the SEC which defendant Masino signed.

122.    As SLM's CEO and Principal Accounting Officer , defendants Andrews (CEO)

and Masino (Principal Accounting Officer) signed Sarbanes-Oxley Act of 2002 certifications falsely stating that the Company's Form 10-Q did not contain any material misstatements or omit material information and that the report fairly presented in all material respects the Company's financial condition and results of operations.

123.    These statements were untrue when they were made because they failed to disclose the problems that SLM was experiencing at the time as alleged herein.

124.    Thereafter, throughout the Fall of 2007, the merger with J. C. Flowers began to collapse as the buyer group refused to consummate the merger because of the recent change in legislation and the turmoil in the credit markets.

125.    On October 10, 2007, defendants caused the Plan to file an annual report on Form 5500 with the Department of Labor for the year ended December 31, 2006.

126.    Defendant McManus signed the annual report as the administrator of the Plan.

127.    The annual report represented that at the end of 2006, the Plan held SLM securities (including SLM common stock) which was fairly valued at $67.7 million.

128.    This statement was materially false and misleading because the price of SLM stock was artificially inflated at the time.

129.    On October 11, 2007 the Company filed a report on Form 8-K which defendant Masino signed and filed with the SEC and which contained a press release entitled "Sallie Mae Student Loan Originations Increase 13-percent From Year-Ago Quarter; Managed student loan portfolio reaches $160 billion."

130.    The Form 8-K reported "a 13-percent rise in [the Company's] student loan originations to $8.9 billion, from the 2006 third quarter's $7.8 billion. Year-to-date 2007, student loan originations were $20.5 billion, compared to $18.6 billion in the same period last year. The

company's managed student loan portfolio totaled $160 billion at the end of the third-quarter 2007."

131.   Defendant Andrews portrayed SLM's business as follows:

"Thanks to our industry-leading brand, our scale and efficiencies, and our focus on students and families, we successfully faced a number of challenges this quarter," said C.E. Andrews, chief executive officer. "We have a solid track record of growing our 'core earnings' through various political, interest rate and economic environments, and the fundamentals of our business point to a bright future for our company."

Sallie Mae reported a third-quarter 2007 GAAP net loss of $344 million, or $.85 diluted loss per share, compared to net income of $263 million, or $.60 per diluted share, in the year-ago period. Included in these GAAP results are pre-tax losses on derivative and hedging activities of $487 million in the third-quarter 2007, principally related to the decline in share price during the quarter on the company's equity forward positions.

Third-quarter 2007 "core earnings" net income was $305 million, or $.70 per diluted share, before $46 million, or $.11 per diluted share, in after-tax reductions to net income from the following non-recurring items: $28 million related to the recent legislative changes in the FFELP risk-sharing percentage and $18 million related to the company's previously announced merger agreement. Including these non-recurring items, reported "core earnings" net income was $259 million, or $.59 per diluted share.

For the first nine months of 2007, "core earnings" net income was $699 million, compared to $927 million in the same period last year.

132.   Throughout November 2007, Sallie Mae's stock continued to drift downward from the mid-$40s range at the beginning of the month to mid to upper $30s by the end of the month as the market began to learn the extent to which the deterioration in the credit market and the extent to which the new legislation would negatively affect Sallie Mae's business.

133.   On December 12, 2007, the Company issued a press release entitled "SLM

22

Corporation Provides Update of Transaction and Financial Outlook." The release stated in part that:

> Over the past eight weeks, in a series of discussions between the company and senior representatives of the Flowers group, Sallie Mae has indicated that, to resolve the dispute between the parties, the company offered to consider an alternative transaction with the Flowers group, and to give them the opportunity to update their due diligence and submit a new proposal to acquire the company with no pre-conditions.

> The buyer's group has indicated to Sallie Mae that it does not wish to pursue these opportunities.

> The Board remains committed to protecting the rights of our shareholders, and will pursue all available recourse, including the company's existing lawsuit against the buyer's group.

> The company has indications of interest, subject to customary terms and conditions, from 10 financial institutions for new secured warehouse funding significantly in excess of $30 billion.

134.    The Company also made the following announcements:

> **Financial Outlook**

> **The company expects fourth-quarter core earnings per diluted share to be in the range of $.52 to $.57, excluding non-recurring items such as merger-related costs. The fourth quarter core earnings per share are being impacted by funding costs and increased reserves for the FFELP loan portfolio.**

> **The company will release its private credit trust data on Friday, Dec. 14, which will show an improvement in charge-offs, 90-day and over delinquencies, and forbearances.**

> **The company is lowering its 2008 core earnings EPS guidance from $3.25 to a range of $2.60 to $2.80 due primarily to increased costs from replacing the company's interim funding facility.**

> **The underlying business drivers for the company are strong and executive management is strategically repositioning certain aspects of the business to allow for maximum growth and earnings opportunities.**

> Equity Forward Contracts

> Separately, the company has reduced the strike and trigger prices
> with its counterparties on equity forward contracts. As a result of
> these transactions, the company's aggregate position on equity
> forward contracts is 48.2 million shares at an average strike price of
> $43.93, with trigger prices ranging from $26.00 to $19.58.
>
> * * *
>
> The Board will continue to work with Sallie Mae's management to
> generate shareholder value, and to grow the company's industry
> leadership position.
>
> Additionally, the company will be permitting its directors and
> executive officers to trade company stock, subject to the company's
> normal trading clearance procedures. Due to the proposed Flowers
> transaction, the company had restricted its directors and executives
> from trading company stock since March 2007.

135.    This was part of a series of partial disclosures and revelations concerning the truth

about Sallie Mae's business operations, finances, business metrics, and future business and financial

prospects.

136.    Nonetheless, Sallie Mae's stock continued to trade at artificially inflated levels as

this revelation, along with the ones made during the remainder of the Class Period, was

accompanied by denials and continued misrepresentations by Defendants.

137.    Upon this partial disclosure, Sallie Mae's stock dropped $3.45 per share on

December 12, 2007, to close at $28.49 per share, a one-day decline of 12% on extremely high

volume.

138.    On December 13, 2007, the Company issued a press release entitled "SLM

Corporation Provides Update on Equity Forward Contracts," which stated in part:

> SLM Corporation, commonly known as Sallie Mae, today
> announced that the company has amended or closed out certain
> equity forward contracts. As a result of these transactions, the
> company's aggregate position on equity forward contracts is 44.0
> million shares at an average strike price of $44.30, with trigger
> prices ranging from $24.75 to $19.58.

24

139.    On December 14, 2007, defendant Lord sold 1,265,401 shares of stock for an average price of $27.36 per share reaping $34.6 million in insider trading proceeds.

140.    In its press release dated December 14, 2007, the Company made the following representations concerning defendant Lord's stock sale, which falsely understated the percentage of the stock he sold:

> In addition, Sallie Mae announced that Mr. Lord today sold 1.2 million shares of SLM common stock, approximately 10 percent of his equity units, on the open market. This action was required under Mr. Lord's borrowing arrangements. Sallie Mae opened its trading window for directors and executive officers today for the first time since discussions with the J.C. Flowers group in March 2007. After the sale, Mr. Lord owns approximately 340,000 SLM shares and share units, and holds stock options and appreciation rights, at various exercise prices, covering approximately 10 million SLM shares.

141.    The stock sale by defendant Lord was again fortuitous, as it came days before the market would learn that the Company might be facing higher financing costs and that the Company would need to add capital.

142.    This news sent Sallie Mae's shares tumbling - closing down 21% in a day. The timing of these stock sales prompted another investigation by the SEC into the Company's disclosures in December 2007, both before and after its executives and directors traded their stock.

143.    On December 19, 2007, *The Wall Street Journal* published an article entitled "Sallie Mae Understated Stock Sale by CEO Lord," which stated in part:

> Albert L. Lord, chief executive of student-loan titan SLM Corp., or Sallie Mae, sold slightly more SLM stock than the company announced last week.
>
> On Friday, Mr. Lord sold 1,265,401 shares of SLM, or 97% of his company stock, according to filings the company made yesterday with the Securities and Exchange Commission. The sales were at an average price of $27.36 a share.

25

That was more than Sallie Mae had disclosed, when it announced
Friday evening that "Mr. Lord today sold 1.2 million shares of SLM
common stock." The company's release also overstated Mr. Lord's
remaining holdings.

A Sallie Mae spokesman acknowledged the errors but didn't
comment further.

Sallie Mae shares have fallen 40% since the beginning of the year,
closing yesterday at $28.87, up 97 cents, in 4 p.m. New York
Stock Exchange composite trading.

The company's business has come under pressure since Congress
agreed to cut subsidies for student-loan providers. In September, a
group led by private-equity firm J.C. Flowers & Co. backed out of
an agreement to buy Sallie Mae for $60 a share.

Sallie Mae had also described Mr. Lord's sale as "approximately
10% of his equity units" - meaning if one adds up the total number
of Mr. Lord's shares, stock options and other derivatives on a one-to-
one basis, the stock sale was of 10% of his total number of Sallie
Mae equity instruments.

For almost all of Mr. Lord's stock options, the exercise price is
higher than the current share price, making them worthless unless
Sallie Mae's share price rises.

Accounting for his various derivatives at their fair values, Mr.
Lord's transaction represents the sale of roughly three-quarters of his
SLM holdings, said someone familiar with the matter.

144.    On December 19, 2007, on the Company's shareholder conference call, defendants

made the following statements:

[Lord:] Let me first talk about the deal. I'm not going to talk very
much about it. As you are well aware, it's not a deal any longer, it's
litigation. I'm going to attempt to engage in a little self-defense,
hopefully not defensively. I and the Company and the Board have
gotten some bad press for not doing a transaction. I know there are
many disappointed recent shareholders. Again, the irony is that my
objective over a 30-year career of representing public companies has
been to reward investors, particularly in this Company which I hold
very dear.

\*       \*       \*

I'm going to mention a few words about my stock sale. My bank

26

sold me out on Friday of 1.2 million shares. I will mention that it's embarrassing and troublesome to me personally. It is not a sign of my disillusionment with the Company; in fact, the exact reverse is the case. It is a short-term cost in my view of my own belief in my company. I suppose you might say, one more victim of an unfinished deal. I can assure you that I'm properly incented to create the earnings growth that is Company has been known for and I have no more margin stock - no more margin.

\*          \*          \*

The other immediate goal, and it has already been started by the Company, is to focus directly on the highest quality private credit asset channels. Intermediate goals - intermediate for me means the - I guess we call it the `08 lending season. It begins in the summer of `08, so we're really talking about maybe July. It is at that point I hope we begin to restore a viable long-term earnings growth rate for the Company. We will continue to capitalize on our on-campus strength and build that credit channel. There are numerous opportunities to consolidate the industry. We have to be very discriminating in that effort, but I see massive opportunity for us to increase share. Again, to acquire that capacity, we will likely use stock. We will not do dilutive transactions. We will not increase our goodwill, and these opportunities will be taken also to build capital.

When people think about this Company in terms of its earnings growth rate, and we have had a pretty impressive growth rate for 25 years, it comes down to very simple, simple basics. It's the growth in the number of students, the growth in the cost of schools and our ability to grow market share. Our focus, particularly now in light of events including legislation, will be to focus our growth targets even more directly on the four-year schools where we want to build market share. Sallie Mae has had a strong double-digit growth rate for 25 years. When we first listed this Company in 1983, I was CFO. The success we have earned over that period has been as a consequence of what I just mentioned - the growth in higher ed, our market share growth. We've achieved those double-digit growth rates in the face of 25 years of margin cuts. This recent round of margin cuts was significant, but is not net. It changes the landscape for us, but if anybody's prepared to deal with that, we are. These macroeconomic facts did not change just because of a failed deal.

\*          \*          \*

Recently, we restruck or reforecast or reguided or whatever is the language we need to use our fourth quarter earnings and our 2008 outlook. I am being asked why. I'm not going to get precise, but the

27

issue is predominantly funding costs. Our securitization market costs are out over 25 basis points. Access there is not as free and is not infinite as it once was. We have discovered an index mismatch between commercial paper on which the student loans earn their interest and LIBOR. This credit crunch has exposed that mismatch, which had never opened in the roughly 10 years we've had this commercial paper index, but it has widened out into double-digits. The interim financing facility provided by the buyer has high financing costs. Replacing it will probably involve higher financing costs. This is not a great time to be financing.

We made a decision on the basis of trying to increase market share to - not to knock out our borrower benefits in response to the recent legislation. Original forecast had us knocking borrower benefits out. There are - and we have moved our private credit provision up a little bit since we have talked to you in October. Since we talked to you in October, this credit crunch reemerged, and - well, so be it.

As I said, I don't want to get into FICO scores and basis points. Steve can help you guys with your models with respect to these issues, and he will. Of course, I hear a lot of questions about private credit quality. I would direct you to our securitization data, which is actually showing mild improvement. At least on a delinquency data versus prior quarters, it seems to be moving in the right direction. I am not the least bit Pollyanna-ish because of those numbers. This is a delicate economic environment; at least it seems to be, so we're watching them very closely. I'm pleased they're going in the right direction, but I also would tell you, we are comparing them to first-half statistics which bear the cost of some operational issues and make it a little bit difficult to fully analyze that data.

We have analyzed our defaults and we have a highly sophisticated and professional group of collectors in our collection function and they've analyzed these defaults and we are on them. We have moved quickly to cut off those loans - the most difficult loans - at their source, and I believe we have a very good understanding of that. This is a very high priority of mine in my new seat.

The very good news is that demand for this product is as strong as ever, and it grows. Almost all marginal funding student borrowing is in the private credit area. Almost every student has used up whatever guaranteed loans are available. So whatever growth and whatever demand increase there is, is typically in the private area. I say that is good news. It gives us the luxury of applying a little more care in the selection of these assets.

I hear noise from a variety of places, some of which make me less than happy about our refinancing our interim facility. That facility comes due in May, although in February it becomes much more expensive. As I said, there seems to be a lot of interest in this facility. We need to remember that this is a fully secured facility. And while it is a bad time to be negotiating interest rates, we are very much in the process. We have a great deal of interest in this, and in my view, it's a matter of cost.

The long-term - I think it's worth noting that the Company has never had an interim facility in its 30-year history. This is a byproduct of a deal. The goal will be of course to have backup facilities in sufficient amount long-term, but obviously the long-term goal is, as we've built capital, is to reduce the size of it, and certainly the cost of it.

I have been CEO and CFO of this Company for 24 years. We - I think the largest that that underlying facility had ever been was $6 billion. That would clearly be insufficient today, but this is a unique situation. Our goal, as I said earlier I think, is to build other avenues to move our assets off-balance sheet.

I'm going to wrap up. As I said, this Company has been around for 35 years. It has led the financing of higher education for 35 years. The macroeconomics of this industry remain the same. There have been a variety of changes, particularly in the legislative area and in the credit markets underlying all of this, but we're doing about a company that seeks to lead and does lead the higher education finance industry and has been in effect wandering off on a different path for the last nine months now. We need to get off that patch and get back on the right path and get back to the double-digit earnings growth that we've had in the past. I have had a 26-year - out of the Company's 35 years, I have been associated with it for 26 years. I am extraordinarily proud of it.

This is just one more major challenge for this Company. We will exceed that challenge. There are lots of worriers in this environment. Just remember, those of you who are worrying, that this business is one of the very few that is not totally recession-proof, but it is virtually recession proof.

145.    Following the Company's conference call, Sallie Mae's stock dropped $5.98 per share, to close at $22.89 per share on December 19, 2007, a one-day decline of 21% on extremely high volume.

146.    On December 20, 2007, The Wall Street Journal published an article entitled

"Sallie Offers Little on Strategy - CEO, in Investor Call, Fails to Assuage Worry As Shares Slide

by 21%," which stated in part:

> Sallie Mae's chief executive rattled investors, declining to answer
> many questions about the student-loan company's finances and
> strategy amid concern about its prospects in the credit crunch.
>
> After a rambling conference call, which Chief Executive Albert L.
> Lord ended with an expletive, shares of Sallie Mae, officially SLM
> Corp., fell $5.98, or 21%, to $22.89 in 4 p.m. New York Stock
> Exchange composite trading. Mr. Lord said the company is
> considering raising money to shore up its balance sheet through an
> offering of common stock, and that Sallie wouldn't consider
> reinstating its dividend - suspended this year - until mid-2008.
>
> Yesterday's conference call caps a tough autumn for Sallie Mae.
> Last week, a $25 billion takeover bid by a group of investors, led by
> private-equity firm J.C. Flowers & Co., came to an end. The two
> sides are now locked in litigation about whether the buyout group
> will have to pay Sallie a $900 million breakup fee. The collapse of
> the deal, which would have given investors $60 a share, follows the
> decision by Congress to slash billions of dollars of subsidies to
> student-loan companies, hurting Sallie's business.
>
> Mr. Lord, after dodging many questions, pledged to answer them at a
> meeting in January. In an apparent reference to investors' anger,
> he said: "I can assure you, you will be going through a metal
> detector." He ended the conference call by saying "Let's go.
> There's no questions. Let's get the [expletive] out of here."
>
> Sallie Mae spokesman Tom Joyce called the metal-detector remark
> "an attempt at humor" and the expletive "an unfortunate slip of the
> tongue." Mr. Joyce said the call had been intended for Mr. Lord, in
> his new role, to give investors a "broad overview" of the company's
> situation.
>
> Mr. Lord, who has been with the company for 26 years, served as
> chief executive from 1997 to 2005. The company named him CEO
> again last week, though he had taken over the principal-executive
> role in November.
>
> Mr. Lord also addressed his recent sale of 1,265,401 shares of
> SLM, or 97% of his company stock. The company's disclosures

suggested he had borrowed against his stockholdings and faced a margin call as the value of his holdings declined. Yesterday, Mr. Lord, who still holds millions of options, said "my bank sold me out" of the shares and called it "embarrassing and troublesome to me personally" and "not a sign of disillusionment with the company."

Mr. Lord, a hard-charging executive known for his brusque manner, is often credited with transforming the company in recent years from a government-sponsored entity into a private firm with fast-growing profits. (Critics said the company was taking advantage of students' ever-higher debts.) "Al's always been a shoot-from-the-hip kind of guy," said Matt Snowling, an analyst at Friedman, Billings, Ramsey & Co., referring to yesterday's conference call. "He shot himself in the foot on this one."

Sallie's travails yesterday show the extreme nervousness of investors about securities backed by financial instruments, such as mortgages and credit cards. Sallie has long prospered because of the robust market for securities backed by student loans, which are guaranteed by the U.S. government.

Yet, Mr. Lord indicated that its costs are rising because investors are nervous even about those securities. Sallie Mae also makes and resells private student loans - which aren't backed by the government. Investors have largely lost interest in those deals, fearing they could be subject to rising defaults.

Sameer Gokhale, an analyst with Keefe, Bruyette & Woods, says he didn't expect students to have trouble getting access to government-backed student loans. But he and other analysts said private loans - often necessary for students amid spiraling tuitions - may end up being less available and more costly. "One has to wonder who is going to be around to lend money to students on the private-loan side," he said.

147.    Furthermore, due to the utter collapse of the Company's stock price by December 19, 2007, most of the trigger prices as set by the Company's equity forward contracts had been reached - meaning that the Company had lost its bet on its own share value and was required to settle its equity contracts.

148.    As a result, on December 26, 2007, the Company announced a proposed $2.5 billion public offering of common stock and mandatory convertible preferred stock in order to

raise the capital required to physically settle its outstanding equity forward purchase contracts. The

offering closed on December 31, 2007, resulting in total net proceeds of $2.9 billion.

149.    Then, on January 3, 2008, the Company filed an 8-K with the SEC which stated in

part:

**Business trends**

> On December 12, 2007, we announced that our business has
> recently been negatively affected as a result of higher funding costs
> (including the costs of utilizing, and the expected costs of
> refinancing, the Interim ABCP Facility, defined below), and
> increased reserves for our Federal Family Education Loan Program
> ("FFELP") loan portfolio. In addition, our business has been
> negatively affected by an index mismatch between the commercial
> paper rate, the index for determining the interest rate we earn on the
> vast majority of our FFELP student loan assets, and LIBOR, the
> index for determining the interest rates on a substantial portion of
> our debt used to fund these assets.
>
> Our management team is evaluating certain aspects of our business
> as a response to the impact on our business of The College Cost
> Reduction and Access Act of 2007 (the "Act"), and current
> challenges in the capital markets. The Act has a number of
> important implications for the profitability of our FFELP business,
> including a reduction in special allowance payments, the
> elimination of the "Exceptional Performer" designation and the
> corresponding reduction in default payments to 97% through 2012
> and 95% thereafter, an increase in the lender paid origination fees
> for certain loan types and reduction in default collections retention
> fees, and account maintenance fees related to guaranty agency
> activities. As a result, we expect that the Act will significantly
> reduce and, combined with higher financing costs, could possibly
> eliminate the profitability of new FFELP loan originations, while
> increasing our risk sharing from our FFELP loan portfolio.
>
> **In response to the Act and market conditions, we plan to be
> more selective in pursuing origination activity, in both
> FFELP loans and private education loans. In addition, we
> plan to curtail less profitable student loan acquisition
> activities such as spot purchases and wholesale
> consolidation loan purchases, which will reduce our funding
> needs.** We expect to see many participants exit the student loan
> industry in response to the Act as well as current market conditions

and we therefore expect to partially offset declining loan volumes caused by our more selective lending policies with increased market share taken from participants exiting the industry. We expect to continue to focus on generally higher-margin Private Education Loans, both through our school channel and our direct to consumer channel, although in the case of the latter, with particular attention to continuing the more stringent underwriting standards that are necessary in this market. We also expect to adjust our private education loan pricing to reflect the current financing and market conditions. We also plan to eliminate certain borrower benefits offered in connection with both our FFELP loans and our private education loans. We will further de-emphasize pursuing incremental consolidation loans, in particular FFELP consolidation loans, as a result of significant margin erosion for FFELP consolidation loans created by the combined effect of the Act and the increased cost of borrowing in the current capital markets. Nevertheless we will continue our efforts to protect selected FFELP assets existing in our portfolio. We expect to continue to aggressively pursue other FFELP-related fee income opportunities such as FFELP loan servicing, guarantor servicing and collections.

*       *       *

The Company intends to use approximately $2.0 billion of the net proceeds from the concurrent offerings described above to settle its outstanding equity forward contract with Citibank, N.A. and repurchase the 44,039,890 shares of common stock deliverable to the Company under the contract. The Company and Citibank, N.A. have agreed to physically settle the contract, and the Company has paid Citibank, N.A. approximately $1.1 billion, the difference between the contract purchase price and the market closing price on December 28, 2007 on the approximate 44 million shares. Consequently, the common shares outstanding on the Company's year-end balance sheet will reflect the shares issued in the public offerings and the physical settlement of the equity forward contract. The Company will pay Citibank, N.A. the remaining balance due under the contract in early January 2008.

**Dividends**

We have not paid any dividends on our common stock since the execution of the merger agreement with the Buyer Group in April 2007. While the restriction on the payment of dividends under the merger agreement has been terminated, we expect to continue not paying dividends in the near term in order to focus on balance sheet improvement and expect to re-examine our dividend policy in the

second half of 2008.

**Management changes and sales of securities**

On December 14, 2007, we announced that our Board of Directors added the Chief Executive Officer title and responsibilities to our Executive Chairman Albert L. Lord. C.E. Andrews, our previous CEO, assumed the role of President.

On the same date, we announced we had opened our trading window for directors and executive officers for the first time since we commenced discussions with the Buyer Group in March 2007. Mr. Lord sold approximately 1.3 million shares of our common stock, or approximately 97% of the common stock that he owned before the sale, on the open market on December 14, 2007. Also on December 14, 2007, Mr. Charles Daley, a director, sold approximately 80,023 shares of our common stock or approximately 68% of the common stock that he owned before the sale. Messrs. Lord and Daley have advised us that these actions were required under their respective borrowing arrangements.

150.    On this news, Sallie Mae's stock dropped $2.49 per share, to close at $16.67 per share on January 4, 2008, a one-day decline of 15% on volume four-times the average three-month volume. This was the lowest Sallie Mae's stock had traded since October 2000.

151.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company failed to engage in proper due diligence in originating student loans to subprime borrowers, particularly those attending non-traditional institutions;

(b)    The Company was not adequately reserving for uncollectible loans in its non-traditional portfolio in violation of GAAP, causing its financial results to be materially misstated;

(c)    The Company failed to disclose known trends and uncertainties as required by SEC regulations concerning collection issues with its non-traditional loan portfolio;

(d)    The Company had far greater exposure to anticipated losses and defaults related to its nontraditional loan portfolio than it had previously disclosed;

(e)    The Company's business model was unprepared for legislative changes that

34

would result in a reduction in federal student lender rate subsidies and an increase in lender risk to a much greater extent than represented by defendants;

(f)    Given the deterioration and the increased volatility in the subprime market and reductions in federal subsidies, the Company would be forced to tighten its lending standards on both its federal loans and private education loans which would have a direct material negative impact on its loan originations going forward; and

(g)    Given the increased volatility in the subprime market and reductions in federal subsidies, the Company had no reasonable basis to make projections about its ability to maintain its current student loan production levels or its ability to manage its costs.

152.    As a result of defendants' false statements, Sallie Mae's stock price traded at inflated levels during the Class Period.

153.    However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 71% from their Class Period prices and near all time high of $57.98 per share in July 2007.

154.    As a result, the Plan and its Participants have been damaged.

## ADDITIONAL REVELATIONS

155.    On January 22, 2008, Corinthian Colleges, Inc., a for-profit post-secondary education company, filed an 8-K with the SEC which stated in part:

> Corinthian Colleges, Inc. ("Corinthian," the "Company," "we" or "us") has been informed by Sallie Mae and two other lenders that they will no longer make private loans available for students who present higher credit risks (*i.e.* subprime borrowers). We understand this change in policy applies to subprime borrowers at post-secondary institutions in general.
>
> Effective October 1, 2007, Congress reduced subsidies for all federal Title IV student financial aid lenders. Those subsidy reductions, coupled with the challenging subprime credit market, have caused lenders to re-evaluate their contractual arrangements with post-secondary institutions, including Corinthian.
>
> The largest of these lenders, Sallie Mae, provided 90% of private

35

loans for Corinthian's students in the United States. Private loans
constituted approximately 13% of our U.S. revenue (on a cash basis)
in fiscal 2007. On January 18, 2008, we received a letter from Sallie
Mae indicating that it was exiting the subprime lending business for
private student loans. Thus, effective March 1, 2008, Sallie Mae will
no longer provide private loans for Corinthian students in the
subprime credit category. In fiscal 2007, approximately 75% of our
private loan portfolio was subprime. We understand that Sallie
Mae's intention is to honor its loan obligations to current students;
continue providing private loans to students with prime credit scores;
and continue providing federal Title IV loans.

156.    Thereafter, other institutions in the for-profit sector, including Career Education

Corp. and Lincoln Educational Services Corp., made similar disclosures regarding Sallie Mae's

change in policy.

157.    On January 23, 2008, the Company issued a press release entitled "Sallie Mae

announces fourth-quarter and full-year 2007 results." The release stated in part:

- Loan Loss Provision Creates Net Loss in Fourth Quarter

- Originations Top $25 Billion

... SLM Corporation, commonly known as Sallie Mae, today
reported "core earnings" results that include a fourth-quarter 2007
net loss of $139 million, or $.36 diluted loss per share, and full-year
2007 net income of $560 million, or $1.23 diluted earnings per
share.

Student loan originations totaled $5.0 billion in the 2007 fourth
quarter and $25.5 billion during the full-year 2007. Student loans
originated through Sallie Mae's internal brands, the most profitable
segment of total student loan originations, grew 27 percent year over
year to $16.6 billion.

***The company recorded a loan loss provision of $575 million on a
GAAP basis, or $750 million on a "core earnings" basis, in the
2007 fourth quarter that contributed to a net loss for the quarter
and reduced earnings for the year. The increase in the provision
relates primarily to the actual and expected performance of the
non-traditional, higher-risk portion of the company's managed
student loan portfolio.***

36

*"While there were some bright spots, we are obviously disappointed by our fourth-quarter results overall Our cost of funds and loan loss expectations were impacted by weakening credit markets" said Albert Lord, chief executive officer. "We faced significant distractions in 2007, but we have taken several of the necessary steps to position the company for a return to strong, quality asset and earnings growth. Our business trends point in the right direction. In 2007, a challenging year for our industry, we helped students with a record amount of financing to pay for college. In 2008 and beyond, our market leadership position will continue to grow together with the demand for higher education."*

\*        \*        \*

Sallie Mae reported a fourth-quarter 2007 GAAP net loss of $1.6 billion, or $3.98 diluted loss per share, including a $1.5 billion mark-to-market loss on the company's equity forward contract, which was physically settled in full in January 2008. This compares to net income of $18 million, or $.02 diluted earnings per share, in the year-ago period.

The GAAP net loss for 2007 totaled $896 million, compared to GAAP net income of $1.2 billion in 2006. The 2007 GAAP results include principally the forward contract mark-to-market loss and private loan loss provision of $884 million.

Fourth-quarter 2007 "core earnings" net loss was $139 million, or $.36 diluted loss per share, compared to net income of $326 million, or $.74 diluted earnings per share, in the year-ago period. Driving the 2007 fourth-quarter's loss were provisions for loan losses of $750 million. This compares to $88 million in the year-ago quarter.

For the full-year 2007, "core earnings" net income was $560 million, compared to $1.3 billion in 2006.

158.    Additionally, in the Company's conference call held on January 23, 2008,

defendants made the following admissions concerning the Company's loan loss provisions:

[Lord]: I am sure there are a lot of people in this room that remember that, their credit worthiness, although they may not have been told that at the time, changed dramatically when they got out of college especially if you went into college - never mind. Graduation is critical. *Sallie Mae may have lent too much money to students who have gone to schools without very good*

37

*graduation records.* Such students at such schools are virtually singly responsible for 60% of the '07 credit losses. Our methodology in creating loan loss provisions tended to look backwards. Because that's the information that we had. But we have specifically identified the borrowers who are not likely to graduate and provided for them this quarter, its a - frankly a different reserving methodology, *but we know those assets are going to default.* And so we have reserved for them. Jack will get into far more detail and lay this out in a way that's comprehensible shortly. I believe our long-term charge off numbers will be less than 3% and in fact the relevant numbers for '07 for the assets that we would say are traditional school assets are something less than 2%.

\*        \*        \*

Quality assets grew in 2007. They will grow in 2008 and they will grow in 2009 and in 2008 and 2009 they will be far higher quality. The top line is not our issue. The issue is getting the top line to the bottom line and as I have said repeatedly, the issue we are dealing with right now, forget all of '07 events, are cost to funds related and bad debt are related. Cost to funds will improve. The timing of that is not in our hands. Loan losses will also improve. In fact despite the fact that we are staring into the face of what looks to be a deteriorating economy, we believe and I am sure you have heard this a thousand times, we have our arms around this major issue. We expect provision - loan loss provision reductions. We are going to be very careful about that obviously because this economy is - maybe hasn't quite found its way yet but I would hope that as early as mid year 2008 you are seeing that. The company has stopped making loans that were predictably not collectible. You may have seen the announcements. I think three of our major customers and unfortunately what was bad news for us in this quarter has turned out to be very bad news for them as well. You may have seen the announcements that we have notified them that we are just not making those loans anymore.

Jack Remondi - SLM Corporation - CFO

\*        \*        \*

Our core earnings for the year totaled $560 million, a 57% decrease on earnings per share to $1.23. This was - the decrease here was primarily driven by the large increase in our loan loss reserve, our provision per loan losses on our private portfolio. Our provision increased by 1.1 billion over 2006.

\*          \*          \*

The bulk of the reserve though, was driven by the private credit portfolio with a 961 million increase in the private loan provision. This increase was driven by worst than expected default trends in a very limited segment of our overall portfolio, its the portfolio that we will refer to as our nontraditional loans. These are loans that are made to lower tier credit borrowers and are attending, for the most part, schools that have a different profile than other institutions. And mostly due to types of degrees that they offer, more associate versus bachelors and as well as the type of students that attend those institutions. I want to be clear here that it's not a - it's not as easy to say, as I think some people have said, for profit, non-profit, those are not distinctions that adequately describe the areas of concern here. This is really a segment of the schools that for one reason or another are bringing in students but not producing graduates. Or if they are producing graduates their graduates are not earning sufficient - they haven't gained a sufficient economic benefit to generate the earnings to pay off and meet the debt obligations associated with their loan. And that's the business that we will be exiting. Given the deteriorating economic environment and the loss of events for the segment of the portfolio, the fact that the loss segment - the loss events for this segment of the portfolio become more evident earlier in the life cycle of the loan, we took this opportunity to take a look at our reserving methodology and really in effect what's happening is we are recognizing that certain segments of our loan portfolio have loss characteristics more visible to us today. This is really driven by the change in the economic environment as it tends to hit people at the lower tier credit qualities hardest and earliest. We did increase our loss expectations on these types of loans earlier this year but the fourth quarter charge is principally reflective of the earlier loss recognition rather than a significant change in expectations as to gross defaults going forward.

\*          \*          \*

Moving on to the private credit portfolio, as we've kind of hinted here, our defaults are highly concentrated, amongst a small set of our borrower population. And in 2007, we experienced a significant decline in the credit quality associated with that segment of the portfolio. These loans today equal about 15% of our managed private credit portfolio, but they generate 60% - or contributed 60% of our total charge offs in 2007. Obviously, a business model that does not make sense. We've taken steps to cease lending activity in these segments of the population and we expect, as Al said in 2008, we will see better loan-loss provisions although because we are looking forward here, higher charge off rates until these loans fully

Case 1:08-cv-04334-WHP    Document 1    Filed 05/08/2008    Page 40 of 56

enter the repayment cycle. From our long history, with we know that graduation is the key to credit quality in the student loan space. People who generate, who get a degree, improve their economic and employment prospects materially and thereby generate the means to repay their loans. Our default experience in 2007 supports this, over 65% of our charge offs in 2007 were from borrowers who withdrew early from their program of study or dropped below less than half time status. And that's important because it's the less than half time is the trigger that throws the loan into repayment. This chart shows you how divergent the experience is amongst the different segments of our portfolio. You can see how much higher not only our delinquency rates associated with these loans which run more than six times higher the delinquency rates of our traditional loan portfolios, and these are delinquencies over 90 days. But that they also experience even higher defaults or charge off rates. These loans default at almost eight times the rate that we see in the traditional portfolio.

As a result of the increased provision for loan losses in our nontraditional portfolio, our allowance at year end is a very healthy 37% of the remaining balance of our nontraditional loans in repayment. Combined our allowance for this segment of the portfolio covers more than three times our charge off rates in 2007 which we think was accelerated also due to some operational issues but primarily due to credit and economic factors. And just to be clear, once again with these changes, we would expect the provision in 2008 to decline. We'll see how much that actually improves given the economic environment and how that drives portfolio performance particularly in the remaining portion of this nontraditional loan portfolio. But we do expect charge off rates to continue to rise in the nontraditional segment as this portfolio transitions from the in school status, where charge offs are obviously zero, to the repayment status. And once that portfolio moves into those segments, then we will begin to see the charge off rate decline for that area. We did - before I leave that, we did make some changes in 2007 regarding the underwriting aspects associated with these loans. We implemented programs that delayed the disbursement of loans between 60 and 90 days after enrollment in order to capture early withdrawal events at these institutions and we also implemented, in 2007, some significant risk sharing agreements with students attending certain schools in this category that had those institutions pick up a material portion of what we would expect to be the default exposure on those loans. That would lead one to believe that our 2007 vintage portfolio, as it enters are repayment, will see better default trends than earlier segments of the portfolio but we still believe they represent an unacceptable level of

default losses and will - was a factor in why we are exiting this business.

This chart is something that people who follow Sallie Mae would have seen before, but it really is the story associated with education lending.  And it bears repeating multiple times, in education, a degree, and the higher that agree, generates higher levels of income and lower levels of unemployment.  Those two factors mean our borrowers, by lending to them - the type of lending that we do is to help people generate an improvement in their economic capabilities.  And it's that improvement that in turn allows them to meet the debt obligations associated with their loans.  If kids don't graduate, it's very difficult. *As we saw earlier, 65% of our charge offs came from students who withdrew.  It's very difficult to collect on that loan over time.*  As this chart also shows is that - it helps to prove here, is that our - with our traditional loan portfolio where graduation rates are high, our performance has been exceptional in the past and we expect that to continue going forward.  Our charge off rates for this portfolio - the segment of the portfolio which again is 85% of our total managed book is well under 2% in 2007. And we expect those kinds of numbers to continue in that low two's kind of range over the life of the portfolio.  Our repayment tools on these loans also help tremendously and help us work with students who are very difficulty making repayment.  This is where the forbearance tool is such a critical component to managing the ultimate loan performance on our private credit assets.  Students generate this higher earnings capability and lower unemployment levels but there are bumps in the road for them.  And that's where forbearance comes into place, if they've graduated, they've generated the means they might just have a temporary experience that requires some relief but once they get beyond that, once they get beyond that, once again we can expect repayment on their loans.  Clearly for students who is withdrawal, forbearance is really only an option - a viable option to the extent that we think it's a bridge to getting them back into an - in enrollment status.  Without that life becomes very difficult for both of us.

159.    On January 28, 2008, *Reuters* published an article disclosing that SLM had

dropped its lawsuit against the buyout group and had received new financing.  The article noted:

> *"With little chance of recovering any of the $900 million termination fee and the legal expenses involved, we believe the company did the right thing and secured funding - presumably at better terms - as a trade-off," said Matthew Snowling, an analyst*

*at investment group Friedman Billings Ramsey.*

*"Sallie Mae has long since lost any legal standing on arguing that a material adverse condition had occurred because the company has continued to lower its earnings forecast over time, citing the government's subsidy cut as a reason," Snowling said.*

*Last week, Sallie Mae posted a fourth-quarter loss due in part to higher provisions for loan losses due to the weakening credit markets.*

Securing the new financing also marks a first crucial win for the company's new chairman, Anthony Terracciano, a veteran banking executive, analysts said. Terracciano, who joined Sallie Mae earlier this month, has worked to stabilize Sallie Mae and restore credibility after the failed merger.

Sallie Mae is expected to pay an interest rate of about 4.5 percent on the 364-day financing package, according to The New York Times.

"While there will certainly be a sigh of relief that the credit line has been refinanced, we would echo management's recent comments that it appears costly," said Credit Suisse analyst Moshe Orenbuch.

### SALLIE MAE'S FALSE FINANCIAL
### REPORTING DURING THE CLASS PERIOD

160.    In order to inflate the price of Sallie Mae's stock, defendants caused the Company to falsely report its results for year-end 2006 and for the first three quarters of 2007 by failing to adequately accrue its loan loss provisions, which overstated the Company's net income, and by concealing known trends and uncertainties with respect to its non-traditional loan portfolio.

161.    The results for year-end 2006 and for the first three quarters of 2007 were included in filings with the SEC and other statements which were disseminated to the Plan and its Participants and were incorporated by reference into Plan documents.

162.    These representations were false and misleading as to the financial information reported and did not fairly represent Sallie Mae's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

163.    One reason that SLM's financial results were false and misleading is that SLM failed to provide an adequate reserve for its loan loss provision related to its non-traditional loan portfolio. Despite evidence that the Company was experiencing a high level of delinquency and charge-offs in its non-traditional loan portfolio, the Company failed to provide an adequate reserve for its subprime borrowers attending non-traditional schools.

164.    Ultimately, Salle Mae was forced to take a charge to increase its loan loss provision by $575 million in the fourth quarter 2007 in order to cover actual and expected loan losses. In total, Sallie Mae's loan provision for 2007 was $1.4 billion compared to $303 million for 2006. A large portion of the charge was related to loans made by the Company prior to 2007 to subprime borrowers attending non-traditional schools.

165.    Furthermore, during the Class Period, Sallie Mae failed to disclose known trends and uncertainties concerning its non-traditional loan portfolio in violation of SEC regulations.

166.    Nonetheless, in violation of both GAAP and SEC rules, Sallie Mae's Class Period SEC filings and Plan communications failed to disclose known trends and uncertainties related to Sallie Mae's operations. Specifically they failed to disclose that the Company was experiencing higher default and charge-off rates at non-traditional schools than at traditional schools, that the Company had failed to engage in proper due diligence in making subprime loans to students attending non-traditional schools, and that the Company had failed to provide an adequate loan loss provision for its non-traditional loan portfolio.

167.    The undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the

43

type of information which is expected to be and must be disclosed.

168.    Throughout the Class Period, Defendants disseminated to the Plan Participants and filed with the SEC annual reports on Form 11-Ks and 10-Ks, and other public statements that were materially false and misleading.

169.    Throughout the Class Period, the Plan documents incorporated by reference the Company's false SEC filings.

170.    Upon information and belief, Defendants regularly communicated with Participants in the Plan about the performance, future financial and business prospects of the Company and its common stock.

171.    During the Class Period, Defendants fostered a positive attitude toward the Company's stock and/or allowed Participants in the Plan to follow their natural bias towards investing in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock. As such, Participants in the Plan were not informed about the true risks presented by investing in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

172.    As alleged above, these and other SEC filings and related statements and releases were inaccurate, incomplete and materially misleading, and reported false financial results, causing the Plan and its Participants to acquire, hold and maintain Plan investments in SLM Stock and to invest in SLM Stock instead of other, alternative investments in the Plan.

173.    As a result, the Company's Class Period financial statements were materially false and misleading and deceived Plan Participants.

174.    In addition, as fiduciaries responsible for monitoring the investment of Plan assets, Defendants failed to adequately review the performance of the other fiduciaries to ensure that

they were fulfilling their ERISA duties.

175.    Defendants, as fiduciaries of the Plan, failed to protect the Plan and its Participants against lost profits and the inevitable diminution in vested benefits.

176.    A prudent fiduciary acting under similar circumstances would have acted to protect Participants against lost profits and unnecessary diminution of vested benefits, and would have made a different investment decision or different disclosures.

177.    Defendants had available to them several different options for satisfying this duty, including: (i) making appropriate public disclosures as necessary; (ii) divesting the Plan of Company stock; (iii) causing the Plan and its Participants to invest in alternative investments in the Plan instead of in SLM Stock; (iv) consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plan; or (v) resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve Participants in the Plan in connection with the Plan's acquisition and holding of Company stock.

178.    Despite the availability of these and other options, Defendants failed to take any action to protect the Plan or its Participants from lost profits or a diminution of vested benefits as a result of the Plan's investment in SLM Stock or in the SLM Stock Fund.

**Damages To The Plan And Its Participants**

179.    Defendants' misleading disclosures and violations of fiduciary duty made it seem that investing in Company stock was appropriate for the Plan and its Participants.

180.    Defendants' breaches of fiduciary duty have damaged the Plan and its Participants.

181.    Because of Defendants' breaches, the Plan and its Participants used retirement assets to acquire Company stock or units in the SLM Fund at prices that were artificially inflated.

182.    Because of Defendants' breaches, the Plan and its Participants used retirement assets to invest in SLM Stock or units in the SLM Fund instead of other alternative investments in the Plan, including alternative Plan investments which out-performed the returns on SLM Stock and units in the SLM Fund.

183.    Because of Defendants' breaches, the vested retirement benefits in the Plan have been significantly diminished and impaired.

184.    When investors began to learn the truth about the problems at SLM, the Company's stock price declined, taking with it the vested retirement benefits in the Plan.

## CLAIMS FOR RELIEF UNDER ERISA

185.    At all relevant times, Defendants were, and acted as, fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

186.    ERISA § 502, 29 U.S.C. § 1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

187.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any diminution of vested benefits to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

188.    ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the

interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things:

> (a)     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance Company stock, to ensure that each investment is a suitable option for the plan; and

> (b)     A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

189.     ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> . . . in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(8), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless be makes reasonable efforts under the circumstances to remedy the breach.

190.     Plaintiff therefore brings this action under the authority of ERISA § 502 for

Plan-wide relief pursuant to ERISA § 409(a) to recover the lost profits and diminution of vested benefits and other damages sustained by the Plan arising out of the breaches of fiduciary duties by Defendants.

<u>COUNT I</u>

191.    Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

192.    Defendants have breached their fiduciary duties as alleged above and have damaged the Plan and its Participants.

193.    Defendants are liable to personally make good to the Plan any losses to the Plan resulting from each fiduciary breach under ERISA § 502(a)(2).

194.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief against Defendants.

<u>COUNT II</u>

195.    Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

196.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

197.    Defendants breached their duty of loyalty by failing to administer the Plan with single-minded devotion to the interests of Plaintiff and the Class, regardless of Defendants' own interests.

198.    Defendants also breached their fiduciary duties by failing to disclose to the Plan's Participants that they had failed to prudently and loyally manage the assets of the Plan in the exercise of their discretion with respect to the SLM Stock.

48

199.    As a direct and proximate result of Defendants' breaches of their fiduciary duties to Plaintiff and the Class, the Plan, and indirectly Plaintiff and the members of the Class, suffered losses for which Defendants are liable.

## COUNT III

200.    Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

201.    The duty of the fiduciary includes, but is not limited to:

    (a)    duty not to misinform;

    (b)    duty to inform when the fiduciary knows or should know that silence might be harmful; and

    (c)    a duty to convey complete and accurate information material to Participants and beneficiaries.

202.    Throughout the Class Period, Defendants failed to provide Plaintiff and the Participants in the Plan with complete and accurate information regarding SLM's operations and risks.

203.    Complete and accurate information was necessary for Plaintiff and the Participants in the Plan to accurately assess the quality of an investment in SLM Stock.

204.    Defendants conveyed materially inaccurate information to Plaintiff and the Class regarding the soundness of SLM Stock and the prudence of investing retirement savings in SLM Stock.

205.    Defendants breached their fiduciary duty to Plaintiff and the Participants by not accurately informing them of the riskiness of saving for retirement with SLM Stock.

206.    Defendants breached their fiduciary duty to Plaintiff and the Participants by failing

to provide an adequate description of the risk of saving for retirement with SLM Stock.

207.    Defendants failed to disclose that the performance and value of SLM Stock in Participants' accounts were substantially affected by facts and risks known to Defendants but unknown to the Participants.

208.    Defendants breached their fiduciary duties in that they failed to accurately disclose material information to Plaintiff and the Participants concerning the Plan's investment options, as alleged above.

209.    Defendants should have known that their actions and inactions would artificially inflate the market price of SLM Stock, and that the price the Plan paid for SLM Stock would likewise be inflated.

210.    The Plan and the Participants relied upon, and are presumed to have relied upon, to their detriment, the actions and inactions of Defendants, their fiduciaries.

211.    As a consequence of Defendants' actions and inactions, the Plan suffered losses.

212.    Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach of their fiduciary duty.

213.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief.

## COUNT IV

214.    Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

215.    By virtue of their fiduciary responsibilities, Defendants were bound to monitor other fiduciaries and to provide them with information sufficient to perform their duties overseeing the Plan and its investments.

216.    Defendants breached their duties to monitor and inform by failing to ensure that the monitored fiduciaries had access to information about SLM's problems and properly disclosed material information to the Plan and its Participants.

217.    Defendants breached their duties to monitor and inform by failing to disclose to the monitored fiduciaries accurate information about the operations of and risks to SLM that Defendants reasonably should have known the monitored fiduciaries needed to have in order to make sufficiently informed decisions about what investment options the Plan should offer and what disclosures it should make.

218.    Defendants are liable as co-fiduciaries because they participated in the fiduciary breaches by their fellow Defendant fiduciaries in the activities described in this Complaint.

219.    Defendants are liable as co-fiduciaries because they enabled the breaches by these other Defendants.

220.    Defendants are liable as co-fiduciaries because they reasonably should have known of these breaches yet made no effort to remedy them.

221.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered losses for which Defendants are liable.

222.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered losses for which Defendants are liable.

## COUNT V

223.    Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

224.    Defendants were duty bound to act with undivided loyalties to the Plan, binding them to discharge their responsibilities solely in the interests of the Plan and its Participants and for the exclusive purpose of providing benefits to the Plan and its Participants.

225.    Defendants breached their duty of loyalty by failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investments in SLM Stock.

226.    Defendants breached their duty of loyalty by failing to disclose facts which made SLM Stock an unsuitable investment for the Plan.

227.    Defendants breached their duty of loyalty by failing to take such other steps as were necessary to ensure that the interests of the Plan and its Participants were loyally and prudently served.

228.    Defendants breached their duty of loyalty by placing the interests of SLM and themselves above the interests of the Plan and its Participants with respect to the investments of the Plan in SLM Stock.

229.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered losses for which Defendants are liable.

## COUNT VI

230.    Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

231.    Each Defendant is liable for the acts of the other defendants as a co-fiduciary.

232.    Defendants knowingly participated in, or knowingly undertook to conceal, the breaches of the other fiduciaries.

233.    Each Defendant by virtue of his or her own breach of fiduciary duty, enabled the other defendants to breach their fiduciary duties.

234.    Each Defendant had knowledge of other defendants' breaches and failed to take reasonable steps to remedy them.

235.    Defendants knew that their actions and inactions, including making materially inaccurate statements about SLM and its business prospects, would artificially inflate the market price of SLM Stock and that the price the Plan paid for SLM Stock would therefore likewise be inflated.

236.    Defendant SLM enabled other defendants to breach their duties of truthful disclosure by failing to exercise its power and fulfill its duties as a plan fiduciary to take reasonable actions to prevent the other defendants from breaching their specific duties. As a co-fiduciary and an Administrator of the Plan, defendant SLM failed to make proper inquiries regarding the Plan's disclosures, management and investment in SLM Stock and remained inactive while other fiduciaries breached their duties of accurate disclosure.

237.    Defendant SLM, as a corporate entity, possessed constructive knowledge of the other defendants' fiduciary breaches because the knowledge and actions of other defendants, as corporate agents, officers, directors and employees of SLM, are attributable to defendant SLM.

238.    Although defendant SLM had constructive knowledge of the fiduciary breaches set forth in this Complaint, it failed to take reasonable steps to remedy those breaches.

239.    As a consequence of Defendants' breaches, the Plan suffered losses.

240.    Defendants are liable to personally make good to the Plan any losses to the Plan resulting from each breach under 29 U.S.C. § 502(a)(2).

## COUNT VII

241.    Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

242.    Defendants caused the Plan to engage in transactions that constituted direct or indirect sales or exchanges of property between the Plan and the party-in-interest, in violation of ERISA § 406(a), 29 U.S.C. § 1106(a).

243.    Defendant SLM is liable for this violation as a "party in interest" as defined in ERISA § 3(14)(c) for participating in the prohibited transactions.

244.    During the Class Period, the Plan invested, upon information and belief, millions of dollars in SLM Stock, at artificially inflated prices. The Plan and its Participants thus over-paid for their "participation interests" in the Plan.

245.    Because the Plan's acquisition of SLM Stock at artificially inflated prices were prohibited transactions, a *per se* violation of ERISA § 406(a), 29 U.S.C. § 1106(a), under ERISA §§ 409(a) and 502(a)(2)-(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff seeks, on behalf of the Plan and the Class, to rescind all transactions purchasing or acquiring SLM Stock.

246.    Further, to restore the Plan and its Participants to the positions they would have been in had Defendants not engaged in the prohibited transactions, the Plan is entitled to recover the amount that the contributions used to purchase SLM Stock for the Plan would have earned had such amounts been invested in suitable investment options.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    A declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plan and its Participants;

54

B.     An Order compelling Defendants to (i) make good to the Plan all diminution of vested benefits to the Plan and all lost profits to the Plan resulting from Defendants' breaches of their fiduciary duties and (ii) to restore to the Plan any profits Defendants made by breaching their fiduciary duties;

C.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched as the result of breaches of fiduciary duty;

D.     An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.     An Order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Company stock or units maintained by the Plan in proportion to the account's diminution of vested benefits attributable to the decline in the price of Company stock and units in the Plan;

F.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.     An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

Dated: May 7, 2008

SQUITIERI & FEARON, LLP

By: _____
        Stephen J. Fearon, Jr.
        32 East 57th Street, 12th Floor
        New York, New York 10022
        Tel: (212) 421-6492
        Fax: (212) 421-6553
        Email: stephen@sfclasslaw.com

WEXLER TORISEVA WALLACE LLP
Edward A. Wallace
55 West Monroe Street
Suite 3300
Chicago, IL 60603
Tel: (312) 589-6272
Fax: (312) 589-6273
Email: eaw@wtwlaw.com

***Attorneys for Plaintiff***